THE MERCHANTS NATIONAL BANK OF NEWTON *vs.* NORTHRUP AND NORTHRUP.

1. It is not sufficient to set aside a deed made by the grantor when in failing circumstances, that his object was fraudulent; it must be shown that the grantor participated in that intent, or had knowledge of the object of the grantor, or of such facts as should have put him upon inquiry as to that object.

2. The mere fact that the grantee has heard of the grantor's suspension or failure in business, or of his being sued, is not in all cases sufficient to make a sale fraudulent or the deed void.

---

The complainant asks to have a deed given by the defendant, M. B. Northrup, to the defendant, W. S. Northrup, for a lot of land in Newton, set aside, on the ground that it was a fraudulent conveyance, made to hinder and delay creditors, and without consideration. The complainant was a creditor of M. B. Northrup, and obtained judgment against him in the Sussex Circuit Court, on the 18th day of June, 1869, on a suit commenced May 15th, 1869. The lot in question was levied on and sold to the complainant under an execution upon that judgment. The deed to W. S. Northrup was dated and delivered June 1st, 1869, pending that suit.

The grounds on which the complainant alleges the deed to be fraudulent, are, first, that it was made without consideration, and secondly, that it was made to defraud and delay the creditors of M. B. Northrup, who was at the time insolvent, and had failed, and that this was known to W. S. Northrup at the time.

The defendants answer separately, and both under oath,

as required.  Both deny that the deed was without consideration, and answer that $800, the consideration named in the deed, was actually paid in good faith, at the delivery of the deed, and retained by the grantor.  Both deny that the conveyance was for the purpose of delaying or defrauding creditors.  M. B. Northrup admits that he had failed, and was insolvent at the time; W. S. Northrup denies that he knew that M. B. Northrup had failed, or was insolvent.

This cause was argued, upon final hearing, upon the pleadings and proofs.

*Mr. Coult* and *Mr. R. Hamilton,* for complainant.

*Mr. Linn,* for defendants.

THE CHANCELLOR.

The evidence shows that M. B. Northrup was insolvent at the time of this conveyance, that he had mortgaged the greater part of his property to raise money to pay debts, and to secure other debts, and that there remained several thousand dollars of debts which were unpaid and unsecured. That the lot in question was the only property, of any value, which he had left that was unincumbered.  That he had refused to include it in the mortgage given to the Sussex Bank, his chief creditor, to which he had mortgaged the largest part of his estate, saying that he intended to reserve this for himself, or for other purposes.  He had offered to convey it to the complainant for $1100, if they would pay him, in cash, $300, the excess over his debt to the complainant, and to allow $800, the amount of that debt, to be retained for its payment.  The complainant declined, because its officers knew of his insolvency, and feared that bankruptcy proceedings might make such sale void.

The real value of the lot was about $1100 or $1200.  M. B. Northrup offered it for $800, being anxious to obtain the cash for his own purposes, before it should be levied upon, or he prevented from selling by proceedings in bankruptcy. It is possible that his object in exerting himself to effect the

sale, and obtain the money, was to pay bona fide debts that he desired to prefer, or some other honest purpose. But so far as he is concerned, his conduct and declarations indicate that his object was to protect this lot, or its value from his creditors.

It is not sufficient for the purpose of setting aside a conveyance like this, that the object of the grantor was fraudulent; it must be shown that the grantee participated in that intent, or had knowledge of the object of the grantor, or of such facts as should have put him upon inquiry as to that object.

M. B. Northrup had for some years carried on a large and successful business at Newton. W. S. Northrup was the son of his half brother, and had been in his employ in his mill for some years, but had left four or five years before 1869, and was living on a farm about eight miles from Newton, and was in the habit of coming to Newton to sell produce occasionally, once a fortnight or oftener.

There is no direct proof whatever to overcome the responsive answers, that the consideration of this conveyance was in good faith paid, at the delivery of the deed. The defendant, W. S. Northrup, was examined as a witness, and again swears to the fact, and the details of the manner and place where it was paid. Circumstances are relied on to throw doubt on this testimony. It may, and does seem strange, that a farmer coming to market, should carry over $800 in bills in his pocket, with no definite object in view. But facts stranger than this constantly come under observation, or are developed beyond doubt by evidence in suits before us. And no judge or juror is justified in disregarding positive testimony, especially when uncontradicted, because it seems to him, on the whole, rather improbable.

W. S. Northrup knew the lot well; he had been employed for years on the adjoining premises, and, if a person of ordinary capacity, must have known its value, and that it was a good bargain, for the price at which it was offered. He saw that his uncle was very anxious to sell for cash, and as he had

the cash, it was natural that he should take advantage of this desire, and make the purchase. And it is possible that he might confide in the assurance of his uncle, that there was no encumbrance. Such confidence, once very general, still continues in some of the rural and less enlightened parts of the state.

Upon the question whether he knew of the failure of his uncle, the circumstances proved throw much greater doubt upon his allegations in his answer and testimony. The inability of M. B. Northrup to pay his debts, became known to many in Newton between May 10th and May 15th. He stopped payment. He himself denies his insolvency, and it is not improbable that he was solvent, except in ability to pay in cash. He testifies that his assets exceeded his debts. But he had actually stopped, and the public impression was that he was insolvent. Several of the neighbors of W. S. Northrup testify that they heard of his failure in April or May. It seems probable that W. S. Northrup, living only eight miles from Newton, and going there once in two weeks, would have heard of the failure of his uncle within two or three weeks after it became known. Yet it is very possible that he may have been once in Newton within that time without hearing of it; and a farmer cultivating several hundred acres at this distance from a town, might, in the busy month of May, have been so occupied on his farm as not to be in the way of neighborhood rumors. There is no direct evidence that he knew of it, except that of a laborer employed on his farm, who says he heard him speak of it in April or May, but who afterwards says it may have been in June. Very little reliance can be placed upon the testimony of a witness who speaks as to time, of a matter like such a rumor more than a year after it occurred. And the fact that the officers of the bank in the same town, which was his principal creditor, who no doubt had the well known vigilance of their class, did not know it until after the 10th of May, convinces me that this witness and the other witnesses who speak of its being notorious in April or the

beginning of May, all partake of the inaccuracy common to the most honest witnesses, who speak of dates from recollection, without any fact or transaction to fix them. I can, without the slightest suspicion of their integrity, conceive that many of these witnesses may not have heard these reports of failure until June, or the last week in May at least, which would make W. S. Northrup's evidence less improbable. I do not think the proof sufficient to overcome his positive oath that he had not heard of the failure before he purchased this lot.

But the mere fact of having heard of suspension or failure, or being sued, is not sufficient in all cases to make a sale fraudulent and the deed void; in bankrupt proceedings it is.

Had it appeared that M. B. Northrup had told his nephew that he had failed, had sold his personal property, mortgaged his real estate, and that the constable had an execution against him, that he had left this lot unincumbered, which he was willing to sell at a low price to raise some money for his pressing necessities, I am by no means satisfied that this, either alone or connected with the other circumstances in this case, would be sufficient to make this conveyance void as against creditors.

There are many objects for which a debtor when pressed, in failing circumstances, may legitimately sell or dispose of his real and personal property, or pay out his money, and such disposition or payment be valid, except so far as prohibited by the provisions of the bankrupt law, which are not in question here.

The complainant has not shown a case from which I can determine that this deed is fraudulent as against creditors.